UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JUDY CODDING,<br><br>       Plaintiff,<br><br>    v.<br><br>PEARSON EDUCATION, INC.,<br><br>       Defendant. | Case No. 18-cv-00817-LB<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING OTHER MOTIONS AS MOOT**<br><br>Re: ECF No. 149, 150, 151, 156 |

## INTRODUCTION

This is a breach-of-contract case regarding bonus payments under an employment agreement.

In 2010, plaintiff Judy Codding, an education professional, began employment with defendant Pearson Education, Inc., pursuant to a written employment agreement ("Employment Agreement"), which was later amended in 2012 by a written exchange of emails ("Email Amendment"). The Employment Agreement provided that Dr. Codding would develop education-course offerings that came to be known as the "Pearson System of Courses" or "PSoC." It also provided that Dr. Codding would receive an initial bonus of $1 million upon her delivery of PSoC to Pearson Education. Dr. Codding developed and delivered PSoC, and Pearson Education paid

1  her that initial $1 million bonus. The Employment Agreement (as amended) set forth an additional

2  bonus structure if PSoC sales met or exceeded certain dollar amounts. Specifically:

3      1.  Dr. Codding would receive a $3 million lump-sum bonus if PSoC sales exceeded $75

4         million.

5      2.  Dr. Codding would receive a 2% royalty for PSoC sales beyond the initial $75 million

6         sales threshold. The Agreements provided that Dr. Codding could accrue royalties up

7         to a ceiling of $3 million but provided that her initial bonus of $1 million would count

8         against her royalties, thus allowing her to accrue up to a net $2 million in royalties.

9  Dr. Codding thus was eligible to receive a maximum bonus of up to $5 million if PSoC sales

10  were $225 million (in addition to the initial bonus of $1 million that she previously received).[1]

11  Dr. Codding was not eligible to receive any additional bonuses or royalties if PSoC sales did

12  not reach the initial $75 million sales threshold

13  In 2016, the parties negotiated Dr. Codding's departure from Pearson Education, which

14  cumulated in a written agreement and release ("Agreement and Release," and together with the

15  Employment Agreement and the Email Amendment, "Agreements"). Among other things, the

16  Agreement and Release provided that Pearson Education would extend the time period for

17  calculating PSoC sales for the purposes of Dr. Codding's bonuses through the 2019 calendar year.

18  PSoC sales have fallen well short of the initial $75 million sales threshold (much less the

19  maximum $225 million sales threshold).

20  Dr. Codding sued Pearson Education for breach of contract, claiming that Pearson Education

21  owes her a $5 million bonus. Dr. Codding argues that the implied covenant of good faith and fair

22  dealing that applies to all contracts required Pearson Education to use "best efforts" to market and

---

[1] At a 2% royalty rate, Dr. Codding needed $150 million in PSoC sales beyond the initial $75 million sales threshold to receive her maximum $2 million in royalties ($150 million in sales × 2% = $3 million in gross royalties, minus her $1 million initial bonus = $2 million in net royalties). $75 million + $150 million = $225 million. *Accord* Codding Dep. – ECF No. 187-5 at 36 (p. 239). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

1    sell PSoC. Dr. Codding claims that Pearson Education failed to use best efforts, thereby breaching

2    its Agreements with her and wrongfully depriving her of her bonuses.

3        The parties each filed motions for summary judgment. Dr. Codding argues that Pearson

4    Education "completely abandoned" any effort to sell PSoC as early as 2016, thereby breaching its

5    purported contractual obligation to use "best efforts" to sell PSoC. Pearson Education argues that

6    (1) the Agreements do not require it to use best efforts (or any efforts) to sell PSoC, (2) it

7    nonetheless expended significant efforts to sell PSoC and thus did not breach any duty to try to

8    sell PSoC that it may have had, and (3) Dr. Codding cannot establish causation or damages

9    because she fails to show that any efforts by Pearson Education would have caused PSoC sales to

10   reach the initial $75 million sales threshold (much less the maximum $225 sales threshold).

11       The court held a hearing and now rules as follows. Dr. Codding's claims fail because she

12   presents no evidence that PSoC sales would have reached the initial $75 million sales threshold

13   even if Pearson Education had used best efforts to sell PSoC, and thus presents no evidence that

14   she would have been entitled to any additional bonuses. Dr. Codding thus fails to show causation

15   or damages, essential elements of her breach-of-contract claim. The court grants Pearson

16   Education's motion for summary judgment and denies Dr. Codding's motion for summary

17   judgment.[2]

19                                    **STATEMENT**

20   **1.  The Parties**

21       Dr. Codding served as Chief Operating Officer and Vice President of the National Center on

22   Education and the Economy ("NCEE"), a nonprofit policy and school reform company.[3] In 1998,

24   [2] The parties also filed ancillary motions. Dr. Codding filed a motion for summary judgment with
     respect to Pearson Education's affirmative defenses. ECF No. 151. Pearson Education filed a motion
25   to exclude certain of Dr. Codding's witnesses from offering expert testimony. ECF No. 149. Dr.
     Codding also filed objections to "new evidence" that Pearson Education submitted with its reply brief
26   in support of summary judgment and asks the court to strike the evidence. ECF No. 169. In light of the
     court's decision on the main summary-judgment motions, the court denies these ancillary motions as
27   moot.

     [3] Answer – ECF No. 62 at 3 (¶ 6).

28

in her capacity as COO and Vice President of NCEE, Dr. Codding co-founded America's Choice, Inc., as a nonprofit subsidiary of NCEE that later became a for-profit entity, and served as its Chief Executive Officer and President.[4]

Pearson Education, Inc. is an indirect wholly owned subsidiary of Pearson plc and sells and distributes educational products.[5]

On August 3, 2010, Pearson plc acquired America's Choice for $80 million in cash.[6]

## 2. The Employment Agreement

In December 2010, following Pearson plc's acquisition of America's Choice, Pearson plc and Dr. Codding entered into a letter Employment Agreement.[7] In December 2012, Pearson plc and Dr. Codding amended the Employment Agreement by a written exchange of emails.[8]

In relevant part, the Employment Agreement described Dr. Codding's duties as follows: "For comprehensive K–10/12 mathematics and literacy courses designed to apply the philosophy of the Common Core State Standards: These courses will cover approximately 150 days of instruction, use multi-media delivery platforms, and have the distinction of being a system of learning through the grades, of engaging students and of being easy for teachers to use."[9] These courses were referred to as the "Pearson System of Courses," or "PSoC."[10] Pearson Education paid Dr. Codding a salary and employment benefits for her services.[11]

---

[4] *Id.* (¶ 7).

[5] *Id.* at 4 (¶ 11).

[6] *Id.* at 4–5 (¶ 12); Defs. Resp. to Pl. 2d Set of Interrogs. – ECF No. 187-4 at 6.

[7] Answer – ECF No. 62 at 5–6 (¶ 13); Employment Agreement – ECF No. 187-3 at 59–61.

[8] Answer – ECF No. 62 at 7 (¶ 20); Email Amendment – ECF No. 187-3 at 62.

[9] Employment Agreement – ECF No. 187-3 at 59 (¶ 1.b).

[10] Second Amend. Compl. ("SAC") – ECF No. 187-3 at 28 (¶ 25); *accord* Answer – ECF No. 62 at 8 (¶ 25).

[11] Answer – ECF No. 62 at 8 (¶ 24); *accord* Employment Agreement – ECF No. 187-3 at 60 (¶ 2.a). While the Employment Agreement was signed by Pearson plc, the parties agree that Pearson Education employed Dr. Codding and paid Dr. Codding's salary, bonuses, and employment benefits and that PSoC was to be a Pearson Education product. Answer – ECF No. 62 at 5–8 (¶¶ 13–14, 16–19, 24), 10 (¶ 32).

The Employment Agreement, as amended by the Email Amendment, provided that, in addition to her salary and other bonuses she received for other work, Dr. Codding would be eligible for bonuses based on PSoC sales, as follows:

> For doing all this work, you'll receive the following (less taxes of all kinds, of course):
>
> . . . .
>
> i. On delivery and acceptance of all the courses, $1m in cash or stock (your choice). This payment will count against the royalty you'll get for future sales . . . .
>
> ii. $2m in cash and $1m in stock once the sales exceed $75m.
>
> iii. a 2% royalty for all sales *over* that number described above, paid in cash to a ceiling of $3m (which includes the $1m you've already received). Thus, if royalties earned pursuant to this paragraph equals $3m, you shall be entitled to receive up to $2m ($3m less the $1m received pursuant to paragraph (i) above).[12]

Dr. Codding affirms that Pearson Education paid her the initial $1 million bonus.[13]

### 3. The September 2015 KPCC Article

In September 2015, the Southern California public-radio station KPCC issued an article regarding the Los Angeles Unified School District ("LAUSD") and PSoC.[14] KPCC reported that:

> Los Angeles Unified Superintendent Ramon Cortines told board members this week he's negotiated a $6.4 million settlement with Apple Inc. and tech company Lenovo to resolve a dispute over faulty software on the tablets they sold to the district.

---

[12] Employment Agreement – ECF No. 187-3 at 60–61 (¶ 2.c.i–iii) (emphasis in original), as amended by Email Amendment – ECF No. 187-3 at 62.

[13] SAC – ECF No. 187-3 at 30 (¶ 32); *accord* Answer – ECF No. 62 at 10 (¶ 32).

[14] Adolfo Guzman-Lopez, *LAUSD Board to Vote on $6.4 Million Settlement Proposal with Apple Over iPad Software*, KPCC (Sept. 25, 2015), *available at* https://www.scpr.org/news/2015/09/25/54648/lausd-board-to-vote-on-6-4-million-settlement-prop (last visited Nov. 8, 2019) ("KPCC Article"). The parties did not attach the KPCC Article to their summary-judgment filings, but they attached letters they exchanged in 2016 discussing, among other things, the KPCC Article and the Article's impact on their relationship. The court therefore addresses the KPCC Article for context. The court does not evaluate or assume the truth of any of the contents of the KPCC Article. *Cf. Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 960 (9th Cir. 2010) (taking judicial notice of news articles "to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true'") (quoting *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)).

. . . .

The settlement covers problems with the software created by Apple subcontractor Pearson Education. The software wasn't ready when the district began distributing the iPads to students two years ago and teachers complained of missing math problems and other issues.

Meanwhile, a Pearson spokeswoman confirmed to KPCC this week that the company is laying off the people who developed the software for LAUSD's iPad program.

That team included Judy Codding, Sherry King, and Susan Sclafani, three people who had email exchanges with top LAUSD officials about Pearson's software before Apple and Pearson submitted their proposal to L.A. Unified. Those exchanges raised questions about whether the bid process for the iPads were appropriately conducted.

A Pearson spokeswoman said the disbanding of the development team was not related to LAUSD's trouble with the company's software on the iPads.

"The core development team has completed the work that we hired them to do. Unfortunately, there are not comparable roles for them available within Pearson," said Laura Howe, Pearson vice president for media and communities, by email.[15]

### 4. 2016 Discussions Between Dr. Codding and Pearson Education

At some point before 2016, Dr. Codding and Pearson Education entered into discussions regarding the future of their relationship.

#### 4.1 The January 2016 Codding Letter

On January 8, 2016, Dr. Codding's husband Richard Codding, who is an attorney who represented Dr. Codding, wrote a letter to George B. Costello, Associate General Counsel at Pearson Education (the "January 2016 Codding Letter").[16] Among other things, the Coddings

---

[15] KPCC Article.

[16] January 2016 Codding Letter – ECF No. 187-5 at 3–8 (COD-00117302–07). Dr. Codding argues that the court should ignore the January 2016 letter, and other letters between the parties, because they have not been authenticated. Pl. Opp'n to Def. Mot. for Summary Judgment ("MSJ") – ECF No. 161 at 13. Dr. Codding makes this argument despite the fact that she herself produced these letters in discovery. Revised Marston Decl. – ECF No. 164 at 2–3 (¶¶ 9–10). (Both sides produced the letters to each other, and Pearson Education attached its version to its motion for summary judgment because Dr. Codding did not bates-stamp her version, but that does not diminish the fact that Dr. Codding produced the letters too. *Id.* at 3 (¶ 10).) Additionally, to close the loop, Pearson Education submitted a declaration from George Costello authenticating the letters. Costello Decl. – ECF No. 167-1 at 2 (¶¶ 5–

raised issues regarding PSoC sales for the purpose of calculating Dr. Codding's bonuses. Mr.

Codding wrote that because Pearson Education had not meaningfully marketed PSoC, the time

period in the Employment Agreement for calculating PSoC sales for the purposes of Dr.

Codding's bonuses — "over the four years from when [Pearson] start[s] selling them (i.e., 2012)"

— should extend through the 2019–2020 school year.[17] He wrote that Pearson Education had no

plans to market PSoC for the 2016–2017 school year and questioned whether PSoC's reputation

was so tarnished by the technical issues that arose with LAUSD that PSoC might never be widely

sold.[18] He wrote that the Employment Agreement did not require Dr. Codding to market or sell

PSoC but that Dr. Codding nonetheless had been the one to line up potential clients and to respond

---

10). Dr. Codding objects, arguing that Mr. Costello's authentication constitutes "new evidence" that Pearson Education cannot submit on reply. Pl. Objs. to New Reply Evid. – ECF No. 169 at 3. Dr. Codding does not dispute the authenticity of the letters that Pearson Education submitted. There is no material dispute that the letters are genuine, and the court can consider them for whatever value they may have. *Cf. Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) ("Because the [document]'s contents could be presented in an admissible form at trial, we may consider the [document]'s contents in the [defendant]'s summary judgment motion.").

[17] January 2016 Codding Letter – ECF No. 187-5 at 4 (COD-00117303) ("It is true that Dr. Codding's agreement with Pearson alludes to 2012 as the year in which it was anticipated that sales of the courses would begin. However, that agreement is dated December 16, 2010, so the 2012 date was clearly nothing more than a guesstimate of when the courses might go on sale. In December of 2010, development of the courses had not even begun in earnest. In fact, it cannot be argued that Pearson began selling the courses until 2013 when Pearson responded to the LAUSD's RFP [request for proposal]. Thus, without any extension of the four year period, pursuant to the terms of the agreement[,] the sales period would run through at least mid 2017. In view of Pearson's inability to develop the technology necessary to implement the courses on the iPad and its consequent inability to meaningfully market the courses during 2014, 2015 and at least early 2016, the sales period should be extended through the 2019–2020 school year.").

[18] *Id.* ("In the draft statement attached to your letter to me of December 16, 2015, you state that Pearson intends to re-launch the courses into the marketplace in the fall of 2016. However, as far as Dr. Codding is aware[,] no marketing plan has been finalized for the PSoC. If the courses were going to be re-introduced in the fall of 2016, because of the selling cycle for school materials, a marketing plan should have been prepared in mid 2015. Accordingly, a full scale marketing of the PSoC in late 2016 appears doubtful and any "re-launching" would likely be limited to small scale pilot programs, hardly calculated to produce any meaningful sales. Indeed, it is our understanding that Pearson has no plans to market the courses for the 2016–2017 school year. Moreover, in view of the widely publicized debacle in LA resulting from Pearson's complete failure to fix the technology in-house or to retain the outside resources necessary to fix the technology (as it is now doing with Accenture), there is a substantial question as to whether the product's reputation is so tarnished that it may never be widely sold.").

to LAUSD's request for proposal, which led to clients' adopting PSoC.[19] Mr. Codding concluded by writing:

> We have now gone back and forth a couple of times on these issues. We hope that this matter can be resolved amicably and without litigation. To do so, we have the following proposal. In view of the facts:
>
> - that the LAUSD iPad program collapsed because Pearson failed to take appropriate steps to develop the technology necessary to fulfill its obligations to LAUSD notwithstanding repeated warnings and notifications from Dr. Codding that the technology was not performing properly;
>
> - that the Pearson technology group consistently and repeatedly made false and misleading statements regarding the status and functionality of the technology;
>
> - that, had Pearson delivered on its commitments to LAUSD to make the technology work, the program would have gone through phrase 3 which would have resulted in far more than the [REDACTED] in sales required to reach the threshold necessary for additional bonus payments under Dr. Codding's agreement;
>
> - that Pearson has made no efforts to sell the PSoC during 2014 and 2015 and appears to have no intention of trying to sell the courses for the 2016–2017 school year;
>
> - that Pearson's egregious failure to develop the technology to make the product work as designed and to fulfill the commitments made to LAUSD and others may have so tainted the product that it may never sell;
>
> - that Pearson's extensive and inexcusable delay in addressing the problems with the technology has so delayed the marketing of the product that Pearson may have missed the market window for the product even if it is ultimately able to fix the technology;

---

[19] *Id.* at 5 (COD-00117304) ("Dr. Codding's agreement with Pearson dated December 16, 2010 contemplated that, after she completed her work assisting with the integration of America's Choice into Pearson, she would develop mathematics and literacy courses aligned with the Common Core State Standards and provided a compensation plan for that work. The agreement did not contemplate or require Dr. Codding to do any other work. In particular, the agreement did not contemplate or require that Dr. Codding engage in sales of the courses[,] which in fact she did[,] being largely responsible for lining up most of the First Implementers. It did not contemplate or require her to be responsible for developing the substantive response to the LAUSD's RFP[,] which she did[,] resulting in Pearson's content being selected by many of the bidders on the RFP[,] including all three of the finalists for the project. The agreement also did not contemplate or require Dr. Codding to lead Pearson's math and literacy course adoption efforts in California[,] which she did[,] resulting in Pearson's PSoC based courses being adopted[,] notwithstanding the opinions of many in Pearson's management that it could not be done.").

- that Dr. Codding performed substantial services on Pearson's behalf far beyond those contemplated by her agreement[,] which services were instrumental in setting up the initial potential successes of the PSoC but for which she was neither evaluated nor compensated; and

- that the statements to KPCC by a Pearson spokeswoman as reported in the article by Mr. Guzman-Lopez were inaccurate, embarrassing and defamatory;

Pearson should pay Dr. Codding the additional [$5 million] that, under the long term bonus plan, would have been paid to her already had Pearson fulfilled its obligations and theoretically will be paid to her under the agreement if Pearson fixes the technology and actively markets PSoC either as a whole or in component parts. In addition, Pearson should pay $1 million to Dr. Codding for the damage to her personal and professional reputation resulting from the comments made to KPCC[,] which surely violated Pearson's policies with respect to the discussion of confidential personnel matters. Also, Dr. Codding should receive the one year's severance salary provided for in her agreement.[20]

### 4.2 The February 2016 Pearson Letter

On February 19, 2016, Mr. Costello wrote a letter responding to Mr. Codding (the "February 2016 Pearson Letter").[21] He rejected Mr. Codding's demand that Pearson Education pay Dr. Codding $6 million and instead reiterated an offer to pay her one year of severance in exchange for her release.[22] He additionally offered to extend the time period for calculating PSoC sales for the purposes of Dr. Codding's bonuses through 2019.[23] He wrote:

It is clear that your client is not now entitled to any payment under the long-term bonus plan contained in her employment agreement with Pearson ("Long-term Bonus Plan" or "Plan") under any legal theory whatsoever. The Long-term Bonus Plan is still in force and your client's right to payment is governed by the terms of the Plan and by actual sales of PSoC.

We do not agree with your position that the sales performance of PSoC is at its current level because of "Pearson's failures". Specifically, we do not agree with the "facts" that you allege in the bullet points appearing in the last two pages of your

---

[20] *Id.* at 7–8 (COD-00117306–07) (redactions in letter as filed with court).

[21] February 2016 Pearson Letter – ECF No. 187-5 at 10–11 (COD-00117311–12).

[22] *Id.* at 10 (COD-00117311).

[23] *Id.* at 11 (COD-00117312).

letter. There are many reasons why sales of PSoC are at their current level, and it is just not the case that Pearson is solely at "fault" for the actions of LAUSD with regard to the PSoC courses. This will become quite clear in any litigation you choose to commence.

More importantly for our discussions, however, it is clearly not true that the PSoC product is "tainted" to the point where it "may never sell". As I shared in my email to you last week, Pearson is updating the product and will be relaunching it later this year. We certainly anticipate further sales of the courses.

Regarding the KPCC article, we have already stated our position on your claims for damages related to the article, and it is not necessary for us to repeat them here, except to reiterate that even if the facts regarding Ms. Howe's statements to the KPCC reporter were as you allege them, your client would still have no valid claim against Pearson as a result of such alleged statements.

<u>Offer of Resolution</u>

Despite our differences, however, and in an effort to reach an amicable resolution of your dispute with Pearson, we are prepared to offer another significant concession in the terms of the Long-term Bonus Plan: we would agree to further toll the period during which your client would be eligible to earn compensation under the Plan (we had previously offered to extend the period through 2017). Subject to your client's signing her release, we would be willing to extend the period during which PSoC sales would be credited to her account under the Long-term Bonus Plan for two additional years, through the 2019 calendar year. (We note that we are under no obligation to offer this concession: the terms of the Long-term Bonus Plan clearly state that the earnings period under the Plan expires in 2016.)[24]

### 4.3 The March 2016 Codding Letter

On March 18, 2016, Mr. Codding wrote a letter responding to Mr. Costello (the "March 2016 Codding Letter").[25] He wrote that Dr. Codding was prepared to accept Mr. Costello's proposal "with a few modifications and clarifications."[26] With respect to the calculation of Dr. Codding's bonus, Mr. Codding wrote:

As for the sales period for the payments under the agreement, Dr. Codding appreciates Pearson's agreement to extend the cutoff. However, as a point of clarification, under the agreement[,] the expiration of the earnings period would not have expired in 2016 as suggested in your letter. The agreement specifically states

---

[24] *Id.* at 10–11 (COD-00117311–12).

[25] March 2016 Codding Letter – ECF No. 187-5 at 13–15 (COD-00117313–15).

[26] *Id.*

that the period extends for four years from when Pearson starts selling the courses. Although at the time the parties entered the agreement they anticipated that Pearson would begin selling the courses in 2012 as suggested in the agreement, Pearson did not, in fact, begin selling the courses until 2013. Consequently, the four year sales period provided for in the agreement would expire in 2017, not 2016. Dr. Codding is prepared to accept the three year extension of the sales period under the agreement but, in view of the uncertainty regarding when Pearson will actually begin selling the courses again (we understand that Pearson is still having trouble making some of the important features of the courses work on the app), proposes that the sales period be extended for three years from the time when Pearson commences a bona fide commercial effort to sell courses which are substantially functional. If Pearson commences such an effort during 2016 as you suggest it will, then the sales period will expire at the end of 2019 as proposed in your letter. However, if Pearson's sales efforts are delayed because of technical difficulties or some other reason, then the sales period under the agreement will be extended accordingly.

. . . .

If this matter can be resolved as proposed here, Dr. Codding and her team, pursuant to mutually agreeable terms, would be willing to assist Pearson in marketing and selling the PSoC.[27]

Mr. Codding additionally proposed several other modifications and clarifications to Pearson Education's proposal.[28]

### 4.4    The April 2016 Pearson Letter

On April 29, 2016, Mr. Costello wrote a letter responding to Mr. Codding (the "April 2016 Pearson Letter").[29] Mr. Costello sent Mr. Codding a draft of a proposed Agreement and Release that he said "reflects, in Paragraph 2, the clarifications and amendments to the Employment Agreement to which we have already agreed in previous letters, and also our agreement on certain of the additional clarifications and amendments that you requested in your March 18 letter."[30] Mr. Costello summarized Mr. Codding's requests from the March 2016 Codding Letter as:

1. A clarification of the rules relating to the sale of identifiable "component parts" of the PSoC courses in other Pearson products.

---

[27] *Id.* at 14–15 (COD-00117314–15).

[28] *Id.* at 13–15 (COD-00117313–15).

[29] April 2016 Codding Letter – ECF No. 187-5 at 17–18.

[30] *Id.* at 17.

> 2. Agreement that your client would receive credit for shipments to certain "First Implementers" for which Pearson did not receive payment, but for which you believe that the materials were provided "with the clear understanding that the course materials would be paid for".
>
> 3. An agreement that Pearson would credit your client with sales of identifiable Professional Development services that are related to PSoC.
>
> 4. An agreement to leave open the possibility of extending the earnings period described in Paragraph 2(c) of the Employment Agreement.
>
> 5. An updated statement of sales through December 31, 2015. (We will send this to you shortly)[31]

Mr. Costello responded that Pearson Education rejected Dr. Codding's proposal to extend the period for calculating PSoC sales for the purposes of Dr. Codding's bonuses beyond 2019 but agreed to the rest of Dr. Codding's proposals.[32] Mr. Costello concluded, "If the Agreement and Release as amended is acceptable to you and your client, please have your client sign two originals of the Agreement and Release and return them to me for countersignature and implementation of the settlement terms."[33]

### 4.5   The June 2016 Codding Letter

On June 24, 2016, Mr. Codding wrote a letter responding to Mr. Costello (the "June 2016 Codding Letter").[34] Mr. Codding said that Dr. Codding had signed Pearson' Education's proposed Agreement and Release. Mr. Codding nonetheless raised objections to the Agreement and Release's calculation of Dr. Codding's bonus:

> Finally, although the Agreement and Release has been executed and Dr. Codding has agreed to proceed under its terms, Dr. Codding continues to be disappointed with Pearson's position with respect to the time for counting sales. In your most recent email, you state that Dr. Codding has already received credit for one year's

---

[31] *Id.* at 18.

[32] *Id.* ("I believe that the amendments to the Employment Agreement that appear in Paragraph 2 of the Agreement and Release are self-explanatory (we have agreed to all of the requests except number 4 above).").

[33] *Id.*

[34] June 2016 Codding Letter – ECF No. 167-1 at 22–23 (COD-00117339–40).

sales and will receive credit for three more. If that turns out to be the case, that is fine. The problem is with when full blown commercial sales will actually begin. The original agreement clearly contemplated that PSoC would go on sale and continue on sale for a period of at least four years. As things turned out, that is not exactly how things went. Following the debacle in LA, the products were taken off the market while the technical problems were being addressed. It remains unclear when those problems will be resolved so that the products function as intended allowing the products to be sold. To give Dr. Codding credit for a real three years of sales rather than the appearance of three years of sales, the start date should be tied to the actual start of full commercial sales.[35]

### 4.6    The July 2016 Pearson Letter

On July 15, 2016, Mr. Costello wrote a letter responding to Mr. Codding (the "July 2016 Pearson Letter").[36] Mr. Costello enclosed a copy of the Agreement and Release countersigned by Pearson Education. With respect to Mr. Codding's comments about Dr. Codding's bonus calculation, Mr. Costello wrote, "With regard to the comments in the third paragraph of your letter about the earnings period: we understand your concern, but we are proceeding in reliance on the signed Agreement and Release and your statement that Dr. Codding 'has agreed to proceed under [the Agreement and Release's] terms', notwithstanding those concerns."[37]

### 5.    The Agreement and Release

The first paragraph of the parties' signed Agreement and Release states that it "set[s] forth the agreement between you [Dr. Codding] and Pearson Education, Inc. and its affiliates (collectively, the 'Company') regarding your separation from the Company."[38] It states, "[a]s an initial matter, we acknowledge that you and Pearson are parties to an employment agreement dated December 16, 2010, as amended on December 21, 2012 (the 'Employment Agreement')."[39] It recites that it

---

[35] *Id.*

[36] July 2016 Codding Letter – ECF No. 167-1 at 25 (COD-00117341).

[37] *Id.* (brackets in original).

[38] Agreement and Release – ECF No. 187-3 at 64.

[39] *Id.*

"contemplates the survival of certain terms under the Employment Agreement, and [] amend[s] certain terms of the Employment Agreement, as . . . described . . . below."[40]

Among other things, the Release Agreement provided:

> [1.]a. In accordance with the Employment Agreement, the Company will pay you an amount equal to one year of your pay at your most recent annual salary with the Company, minus applicable payroll taxes and withholding. The Company will make this payment in a lump sum, minus applicable payroll taxes and withholding, within 21 days after your sign and return this Agreement and Release to the Company (provided you have not revoked the Agreement and Release).

> . . . .

> [1.]d. Further, you will continue to be eligible to receive bonuses that may be earned in the future under Paragraph 2(c) of the Employment Agreement, subject to and in accordance with the terms of the Employment Agreement . . . .

> . . . .

> [2.]c. The time period described in the first sentence of the first subparagraph of Paragraph 2(c) of the Employment Agreement for crediting 'performance of the courses' shall be extended to include performance through the 2019 calendar year.

> . . . .

> **[7.]a. The consideration you receive under this Agreement and Release is in complete discharge, release, and satisfaction of all obligations and liabilities (except as otherwise described in this Agreement and release [sic]) of Pearson Education, Inc. and its affiliates, including but not limited to Pearson, Inc., Pearson plc, Pearson Education Holdings, Inc., Pearson Education and Assessment, Inc., The Pearson Charitable Foundation, NCS Pearson, Inc., and all of their respective officers, directors, employees, bonus and/or compensation plans (collectively, the 'Released Parties') with regard to any matter or event whatsoever that occurred or happened up to the date of this Agreement and Release, including but not limited to matters regarding your employment with the Company and its termination. . . .**

> **. . . .**

> **[7.]c. This release does not apply to any rights or claims that arise after the date you sign this Agreement and Release.**

> **[7.]d. This release does not apply to any rights you may otherwise have to receive bonuses that may be earned in the future under the terms of Paragraph 2(c) of the Employment Agreement, as amended and clarified by Paragraph 2 of this Agreement and Release, above, and any such rights to**

---

[40] *Id.*

**earn such bonuses, in accordance with the terms of the Employment Agreement, survive the termination of your employment with Pearson.**[41]

From 2010 (the time Dr. Codding joined Pearson Education) through the end of 2015, lifetime PSoC sales totaled $6,002,972.[42] Under the Agreement and Release, Pearson Education additionally credited Dr. Codding with certain "sales" where Pearson Education later provided refunds to customers and other sales that had been invoiced but not collected.[43] Taking all of these together, through the end of 2015, there had been a total of $16,415,376 in PSoC sales for the purposes of calculating Dr. Codding's bonuses.[44] As such, for Dr. Codding to receive her initial $3 million bonus, there would have to be an additional $58,584,624 in PSoC sales before the end of 2019; for Dr. Codding to receive her maximum $5 million bonus, there would have to be an additional $208,584,624 in PSoC sales.

## 6. What PSoC Sales Would Have Been Had Pearson Education Used Best Efforts

### 6.1 Actual PSoC Sales

Pearson Education attached to its motion for summary judgment a spreadsheet listing PSoC profit and loss ("P&L") from 2011 through 2018.[45] The P&L chart states that there were $12,000 in PSoC bookings in 2016, $1,406,733 in 2017, and $327,290 in 2018, before taking into account offsets for paying returns to customers and other changes to deferred revenue.[46] The chart does not break down 2016 into the period before July 2016 (when the parties signed the Agreement and Release) versus after; if one were to credit all 2016 bookings to the post-July period, the chart

---

[41] *Id.* at 42 (¶ 1.a), 43 (¶ 1.d), 45 (¶ 2.c), 46–47 (¶ 7.a, c–d) (emphasis in original).

[42] *Id.* at 74.

[43] *Id.* at 65–66 (¶ 2.a).

[44] *Id.* at 74.

[45] PSoC P&L Chart – ECF No. 187-4 at 14 (COD-00000018).

[46] *Id.*

indicates that there were a total of $1,746,023 in PSoC bookings between 2016 and 2018, before taking into account offsets for paying returns to customers and changes to deferred revenues.[47]

Dr. Codding attached to her motion for summary judgment excerpts from a deposition of one of her former colleagues, Deborah Rives, a member of the PSoC services team at Pearson Education until she left Pearson Education in 2019.[48] (Dr. Rives was not a member of the PSoC sales team.[49]) Dr. Rives reviewed Pearson Education's P&L chart and agreed that PSoC sales were "very bad" and that "there were no sales of PSoC."[50]

### 6.2  Pearson Education's Efforts to Sell PSoC

The parties submit various documents that they say are relevant to Pearson Education's efforts or lack of efforts to sell PSoC.

Dr. Codding relies primarily on the deposition testimony of her former colleague Dr. Rives. Dr. Rives testified that she never saw a sales budget for PSoC.[51] She testified that Pearson Education made no efforts to sell PSoC in 2016, 2017, or 2018.[52] She also testified, however, about some of Pearson Education's efforts with respect to PSoC. According to Dr. Rives:

1. Pearson Education retained a technology expert to create a Chromebook app for PSoC on the belief that most school districts were buying Chromebook devices (which were cheaper than other devices) and that there would be a better chance of selling PSoC if it had a Chromebook app.[53] The technology expert was supposed to complete the app by December 2016.[54] It did not turn over an app to Pearson Education until the summer of

---

[47] *Id.*

[48] Rives Dep. – ECF No. 187-3 at 10 (pp. 66–67); Rives Dep. – ECF No. 187-5 at 56 (p. 113).

[49] Rives Dep. – ECF No. 187-5 at 56 (p. 113).

[50] Rives Dep. – ECF No. 187-3 at 7 (pp. 53–54).

[51] *Id.* (p. 54).

[52] *Id.* at 11–12 (pp. 72–73).

[53] *Id.* at 7 (p. 56).

[54] *Id.*

2017, and even at that point, the app was not viable — as Dr. Rives characterized it, "[i]t was still not a functional — for a classroom — app."[55]

2. Pearson Education invested in search-engine optimization to boost PSoC sales and developed a pilot-and-demonstration process for school districts to run trials with PSoC.[56]

3. Pearson Education developed an email campaign to send out mass emails to school districts to try to sell PSoC.[57]

4. Pearson Education held a number of 30-minute webinars for its sales force to educate its sales force about PSoC.[58]

Dr. Codding's counsel asked Dr. Rives about Pearson Education's PSoC P&L chart.[59] Specifically, reading from Pearson Education's responses to Dr. Codding's interrogatories, counsel asked, "[Pearson Education said] 'Pearson Education's efforts to sell PSOC and its investments to support those efforts have continued since July 15, 2016. Indeed, since the start of 2016, Pearson Education has made an additional cash contribution of $45.6 million to PSOC.' Do you know whether that's true or not?"[60] Dr. Rives responded, "I don't."[61]

Pearson Education, for its part, maintains that it did in fact spend $45.6 million on PSoC since 2016 and attaches to its motion for summary judgment a number of documents and presentation slides that it contends support its position that it spent considerable amounts and made efforts to try to sell PSoC.[62]

---

[55] *Id.* at 7–8 (pp. 56–57).

[56] *Id.* at 8 (p. 57).

[57] *Id.* (p. 58).

[58] *Id.* (p. 59).

[59] *Id.* at 7 (p. 55–56).

[60] *Id.*

[61] *Id.* (p. 56).

[62] Def. MSJ – ECF No. 187-6 at 14–20 (citing documents). Dr. Codding's counsel submits a declaration stating that, "Using my firm's document review system, I could find no document in PE [Pearson Education]'s document production that indicates that PE has made any effort to actually sell the Pearson System of Courses after July 15, 2016, and no document that indicates that, after January

### 6.3 What PSoC Sales Would Have Been

Dr. Codding does not offer evidence addressing the issue of what PSoC sales would have been had Pearson Education used additional efforts or "best efforts." She argues instead that she has no obligation to offer affirmative evidence on this issue until trial.[63]

The only thing that Dr. Codding identifies that is even tangentially related to this issue is a snippet from Dr. Rives's deposition testimony. At one point during Dr. Rives's deposition, Dr. Codding's counsel asked her to read pages two to four of the Second Amended Complaint ("SAC"), and then to read paragraphs 13 to 42, 45 to 76, and 96 to 109, and then asked, "[a]nd from reading those, you find nothing inaccurate in the text you've just read?"[64] Dr. Rives answered, "I won't know about some of these numbers, but I don't find anything inaccurate, no."[65] Dr. Codding argues that one of the paragraphs among the 70-plus paragraphs of the SAC that her counsel asked Dr. Rives to read alleges, "[t]he evidence is therefore overwhelming that, had Pearson Education used its best reasonable efforts after July 15, 2016 to sell PSoC, rather than abandoning it and selling other course products, it would have achieved PSoC sales levels

---

1, 2018, PE has taken any steps to try to sell the Pearson System of Courses." Kieve Decl. – ECF No. 187-2 at 5 (¶ 35). Counsel's conclusory declaration that he could not find certain documents is not evidence that such documents do not exist (as opposed to, e.g., Dr. Codding's possibly failing to request the right documents or her counsel's possibly failing to search his document-review system thoroughly). Dr. Codding also argues that many of Pearson Education's documents are inadmissible. Pl. Opp'n to Def. MSJ – ECF No. 161 at 11–14. Because the court's decision on the parties' summary-judgment motions does not turn on the admissibility or inadmissibility of Pearson Education's documents, it declines to address Dr. Codding's objections here.

[63] Pl. Opp'n to Def. MSJ – ECF No. 161 at 16–17 ("*Second*, the issue is not what PE did (and we know it has no evidence that it did anything). It is whether, had PE used its best and reasonable efforts, it would have sold enough PSoC to meet Dr. Codding's bonus level. At the summary judgment stage, Dr. Codding has no obligation to adduce this evidence. . . . *Fifth*, Dr. Codding's trial witnesses, including Dr. Rives (in person or through her deposition testimony), will demonstrate that, with reasonable best efforts, PE could and would have sold enough PSoC to require the payment of Dr. Codding's bonus. *Sixth*, because PE has failed to meet its burden of showing that Dr. Codding cannot prove this (and has offered no admissible evidence of it in its motion), Dr. Codding has no obligation to offer affirmative evidence on this issue until trial.") (emphasis in original); Pl. Reply in Supp. of MSJ – ECF No. 187-8 at 9–10 (same). Dr. Codding did not submit any declarations or other evidence from any of her prospective trial witnesses other than Dr. Rives.

[64] Rives Dep. – ECF No. 187-3 at 10–11 (pp. 67–70).

[65] *Id.* at 11 (p. 70).

sufficient to meet Dr. Codding's entitlement to her contractually promised bonus."[66] Dr. Codding intimates that Dr. Rives endorsed that paragraph and thereby opined that PSoC sales would have reached the thresholds necessary for Dr. Codding to receive her bonuses if Pearson Education had used best efforts to sell PSoC.

Dr. Rives did not affirmatively testify about what PSoC sales would have been had Pearson Education used best efforts. Even if she had, Dr. Codding has not identified anything in the record that supports Dr. Rives's competency to offer such an opinion.[67]

### 7. Pearson Education Sells the Division That Contains PSoC

Effective March 29, 2019, Pearson Education sold off its U.S. Learning Service Division — the Pearson Education division that contained PSoC — to Nexus Capital Management LP.[68] The business is now known as Pearson K12 Learning LLC.[69] Pearson K12's Senior Vice President, Finance, submitted a declaration stating that Pearson K12 is continuing the efforts of Pearson Education to market and sell PSoC and that Dr. Codding's Employment Agreement and the Agreement and Release were assigned to Pearson K12.[70]

---

[66] Pl. Opp'n to Def. MSJ – ECF No. 161 at 17 (quoting SAC – ECF No. 187-3 at 45 (¶ 109)).

[67] *Cf.* Rives Dep. – ECF No. 187-5 at 61 (p. 129) ("Q. Okay. You were asked to read through a number of paragraphs. I don't know if it was 50 or 100 or what, but of the Complaint that Ms. Codding has — A. Right. Q. You remember doing that? A. Yes. Q. And then you were asked the question — was there anything in there you saw that was false, right? A. Right. Q. And as I understood the answer that you ultimately gave, there was a lot of stuff in there you didn't know, right? A. Correct. Q. But the things you did know about, you didn't see anything in there that was false; is that fair? A. Correct. Q. But there's stuff in there that you wouldn't know whether it was right or wrong because you didn't know about it period? A. That's correct."); Rives Email – ECF No. 187-7 ("It came out in the deposition that I was not in sales and may not have known of other strategies to sell PS[o]C. So I suspect there will be other people deposed who were in sales.").

[68] Fletcher Decl. – ECF No. 156-1 at 1 (¶ 3).

[69] *Id.* at 1–2 (¶ 3).

[70] *Id.* at 2 (¶¶ 3–4).

## STANDARD OF REVIEW

The court must grant a motion for summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Instead, it views the evidence in the light most favorable to the non-moving party and draws all factual inferences in the non-moving party's

favor. *E.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

## ANALYSIS

### 1. Governing Law

Dr. Codding claims that Pearson Education breached the implied covenant of good faith and fair dealing in the parties' Agreements.

"The covenant of good faith and fair dealing is implied in every contract and prevents one party from 'unfairly frustrating the other party's right to receive the benefits' of the contract." *Codding v. Pearson Educ., Inc.*, No. 18-cv-00817-LB, 2018 WL 4501131, at *8 (N.D. Cal. Sept. 18, 2018) (quoting *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349 (2000)). "To allege a claim for breach of the covenant of good faith and fair dealing, a plaintiff must allege the following elements: (1) the plaintiff and the defendant entered into a contract, (2) the plaintiff did all or substantially all of the things that the contract required her to do or that she was excused from having to do, (3) all conditions required for the defendant's performance had occurred, (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract, and (5) the defendant's conduct harmed the plaintiff." *Id.* (citing *Qingdao Tang-Buy Int'l Import & Export Co., Ltd. v. Preferred Secured Agents, Inc.*, No. 15-cv-00624-LB, 2016 WL 6524396, at *5 (N.D. Cal. Nov. 3, 2016); *Oculus Innovative Scis., Inc. v. Nofil Corp.*, No. C 06-01686 SI, 2007 WL 2600746, at *4 (N.D. Cal. Sept. 10, 2007)). "Regarding the last element — that the defendant's conduct harmed the plaintiff — '[c]ausation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain.'" *Id.* (nested internal quotation marks omitted) (quoting *Siqueiros v. Fed. Nat'l Mortg. Ass'n*, No. EDCV 13-01789-VAP (DTBx), 2014 WL 3015734, at *5 (C.D. Cal. June 27, 2014)). "'The test for causation in a breach of contract action is whether the breach was a substantial factor in causing the damages.'" *Id.* (nested internal quotation marks omitted) (quoting *Siqueiros*, 2014 WL 3015734, at *5). "'[M]ere conclusory statements do not suffice' to sufficiently state a breach of contract cause of action." *Id.* (nested internal quotation

marks omitted) (quoting *Ketab Corp. v. Mesriani & Assocs., P.C.,* 734 F. App'x 401, 408 (9th Cir. May 2, 2018) and citing *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1029 (N.D. Cal. 2012)).

The plaintiff bears the burden of "establish[ing] a causal connection between the breach and the damages sought." *Thompson Pac. Constr., Inc. v. City of Sunnyvale*, 155 Cal. App. 4th 525, 541 (2007) (quoting 1 Witkin, Summary of Cal. Law (10th ed. 2005) ch. I, § 870). Additionally, the plaintiff bears the burden of establishing damages with "reasonable certainty and probability." *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 961 (9th Cir. 2001) (quoting *Caminetti v. Manierre*, 23 Cal. 2d 94, 101 (1943) (in bank)). As the Ninth Circuit held in a breach-of-contract case, summary judgment in favor of defendants is appropriate where "[plaintiffs] submitted no specific facts on which a finder of fact could reasonably conclude that [plaintiffs] actually suffered damages, caused by [] defendants, in any quantifiable amount." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 809 (9th Cir. 1988).

## 2. Application

### 2.1 Dr. Codding Offers No Evidence With Respect to Causation or Damages

Dr. Codding cannot withstand Pearson Education's motion for summary judgment because she has no evidence regarding causation or damages, essential elements of her breach-of-contract claim.

By her own admission, Dr. Codding submits no evidence establishing causation and damages. Instead, she takes the position that she "has no obligation to offer affirmative evidence on this issue until trial."[71] Dr. Codding contends that Pearson Education bears the burden of affirmatively showing that she cannot prove causation and damages at trial and that, because Pearson Education has not met this supposed burden, she need not offer any evidence regarding causation and damages at the summary-judgment stage.[72]

---

[71] Pl. Opp'n to Def. MSJ – ECF No. 161 at 17; Pl. Reply in Supp. of MSJ – ECF No. 187-8 at 10.

[72] Pl. Opp'n to Def. MSJ – ECF No. 161 at 17; Pl. Reply in Supp. of MSJ – ECF No. 187-8 at 9–10.

Dr. Codding is wrong. Because Dr. Codding bears the burden of proof at trial in establishing causation and damages, Pearson Education "need only point out 'that there is an absence of evidence to support [Dr. Codding]'s case'" to meet its initial burden on its summary-judgment motion. *Devereaux*, 263 F.3d at 1076 (quoting *Celotex*, 477 U.S. at 325). Pearson Education does not need to disprove Dr. Codding's claims of causation or damages because Dr. Codding has no evidence of causation or damages. *Cf., e.g.*, *Hodes v. AMCO Ins. Co.*, No. 13-CV-0085 W (NLS), 2014 WL 12531092, at *8 (S.D. Cal. Oct. 24, 2014) ("[B]ecause [plaintiff] bears the burden of establishing causation at trial, it is not enough for him to argue [defendant] has failed to provide evidence on causation. Rather, [plaintiff] bears the burden of producing actual evidence supporting an inference that [defendant] caused the damages . . . ."). Pearson Education has pointed out that there is an absence of evidence to support Dr. Codding's causation and damages theories. The burden then shifts to Dr. Codding to produce some evidence from which a factfinder could reasonably conclude that Dr. Codding actually suffered damages, caused by Pearson Education, in a quantifiable amount. *Cf. McGlinchy*, 845 F.2d at 809.

As the court previously observed, *Codding*, 2018 WL 4501131, at *9, the parties' agreements do not provide Dr. Codding with a straight commission or royalty from PSoC sales. Instead, they provide Dr. Codding with a bonus only if PSoC sales exceed an initial $75 million sales threshold.[73] If PSoC sales do not reach $75 million, Dr. Codding is not entitled to any bonus (beyond the $1 million initial bonus she already received). Dr. Codding submits no competent evidence about what PSoC sales would have been if Pearson Education had used best efforts to sell PSoC, much less evidence that those sales would have exceeded $75 million.[74] She thus

---

[73] Additionally, Dr. Codding claims as damages not just her initial bonus of $3 million but her maximum possible bonus of $5 million. SAC – ECF Nos. 49-4 (under seal), 50 (redacted version) at 31–32 (¶¶ 148–53). Dr. Codding would have to show that PSoC sales would have exceeded not only $75 million but $225 million for her to be eligible for that maximum bonus.

[74] Dr. Codding selectively quotes the court as saying at the pleading stage that "Pearson Education's breach — limited to the conduct after July 15, 2016 — was the proximate cause of PSoC sales falling short of the Threshold Amount." Pl. MSJ – ECF No. 150-3 at 9 (purporting to quote *Codding*, 2018 WL 4501131, at *9). What the court actually said was that at the pleading stage, "*Dr. Codding therefore must allege non-conclusory facts that plead that* Pearson Education's breach — limited to conduct after July 15, 2016 — was the proximate cause of PSoC sales falling short of the Threshold

submits no competent evidence she has been damaged, much less that Pearson Education caused this damage. Summary judgment for Pearson Education therefore is appropriate.[75]

## 2.2 Dr. Codding's Arguments Do Not Excuse Her Lack of Evidence

Dr. Codding makes several arguments to address her lack of evidence regarding causation and damages. They do not change the outcome.

### 2.2.1 Burden-shifting

First, Dr. Codding argues that if she establishes that Pearson Education used no efforts to sell PSoC, then the burden then shifts to Pearson Education to prove that its efforts would not have led to sales sufficient to reach her bonus thresholds.[76] She cites three cases to support this argument: *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979), *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264 (Del. 2017), and *CKB & Associates, Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577 (Tex. Ct. App. 1991).[77] These cases do not support her argument.

*Bloor* addressed a contract where a buyer bought rights to a brewery's labels, trademarks, and distribution system in exchange for expressly covenanting to use "best efforts" to promote and maintain a high volume of beer sales and to pay a royalty of $0.50 per barrel sold. *Bloor*, 601 F.2d at 610. The district court there concluded that the buyer had breached its best-efforts covenant. *Id.* at 615. The district court then "was faced with a difficult problem in computing what the royalties on the lost sales would have been." *Id.* The district court looked to the sales of two similar beers to

---

Amount." *Codding*, 2018 WL 4501131, at *9 (emphasis added). And now, at the summary-judgment stage, Dr. Codding must offer *evidence* that Pearson Education's breach — limited to conduct after July 15, 2016 — was the proximate cause of PSoC sales falling short of the Threshold Amount. Dr. Codding's quoting of the court's prior order is misleading.

[75] Dr. Codding also argues that Pearson Education breached its Employment Agreement by selling off its U.S. Learning Service division, thereby rendering it impossible for Pearson Education to sell any more PSoC, and Pearson Education thus has breached its Agreements with her. This argument fails. Even assuming Pearson Education breached the Agreements by selling off its U.S. Learning Service division, Dr. Codding's claim would still fail due to her lack of evidence regarding causation or damages, i.e., evidence that Pearson Education's selling its U.S. Learning Service division was the cause of PSoC sales falling below $75 million.

[76] Pl. Reply in Supp. of MSJ – ECF No. 187-8 at 10–11 (same).

[77] *Id.*

compute what the beer-in-suit's sales would have been. *Id.* The Second Circuit affirmed the district court's damages calculation, holding that "in a situation like this, certainty is not required; '[t]he plaintiff need only show a stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached.'" *Id.* (nested internal quotation marks omitted) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918,926 (2d Cir. 1977)). Two significant factors distinguish *Bloor* from this case. First, the royalty in *Bloor* was a straight royalty and was not subject to a sales threshold. *Id.* at 610. Every lost beer sale thus caused a loss in royalties and, hence, damages to the brewery. Here, by contrast, Dr. Codding's bonuses are subject to a sales threshold. Dr. Codding is not entitled to any bonus unless PSoC sales reach an initial $75 million sales threshold. If, hypothetically, Dr. Codding were correct that by the start of 2016, "[PSoC]'s reputation [wa]s so tarnished that it may never be widely sold,"[78] such that even Pearson Education's best efforts would not have resulted in $75 million in sales, any failure to exert best efforts could not cause Dr. Codding any damages. Second, the plaintiff in *Bloor* offered evidence in support of its damages calculation, namely, the testimony of an expert witness who compared the sales of the beer-in-suit with six other groupings of beer to calculate what sales would have been had the defendant used best efforts. *Bloor v. Falstaff Brewing Corp.*, 454 F. Supp. 258, 277–78 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979). Here, by contrast, Dr. Codding offers no method to calculate what PSoC sales would have been had Pearson Education used best efforts, and she points to no evidence that could satisfy *Bloor*'s requirement that a plaintiff show "a stable foundation for a reasonable estimate of royalties [s]he would have earned had defendant not breached." *Cf. Bloor*, 601 F.2d at 615.

*CKB* does not provide any better support for Dr. Codding's arguments. *CKB* addressed a contract where a petroleum refiner expressly agreed to use its "best efforts" to refine 15,000 barrels of crude oil into various refined products, including "JP-4 jet fuel," for a petroleum seller.

---

[78] January 2016 Codding Letter – ECF No. 187-5 at 4 (COD-00117303). Dr. Codding cannot bring a claim for any pre-July 2016 tarnishing of PSoC's reputation because she released all pre-July 2016 claims against Pearson Education and its affiliates in the Agreement and Release. Agreement and Release – ECF No. 187-3 at 68–69 (¶ 7.a).

*CKB*, 809 S.W.2d at 578. The refiner did not meet the contract targets for the various refined products; it refined higher quantities of certain lower-cost products and lower quantities of certain higher-cost products, including the JP-4 jet fuel. *Id.* at 579. The Texas Court of Appeals affirmed the trial court's finding on summary judgment that it was undisputed that the refiner failed to use its best efforts to meet the contract targets. *Id.* at 582. (Among other things, the plaintiff submitted an unrebutted deposition of a manager at the refiner who testified that the refiner could have doubled its JP-4 production had it chosen to do so. *Id.*) With respect to damages, the plaintiff seller submitted affidavits and depositions that it could have sold more JP-4 (and thus made more money) if the refiner had not breached its obligation to refine a sufficient quantity of JP-4. *Id.* at 583. The refiner introduced no summary-judgment evidence in response. *Id.* Here, unlike the plaintiff seller in *CKB*, Dr. Codding does not offer any evidence to support that Pearson Education could have made $75 million or more in PSoC sales, thereby requiring a bonus.[79]

Finally, not only does *Williams* fail to support Dr. Codding's argument, it affirmatively undermines it. *Williams* addressed a merger agreement where the defendant agreed to acquire the assets of the plaintiff, conditioned on the defendant's counsel issuing a legal opinion ("721 Opinion") that the transfer of the plaintiff's assets to the defendant, in exchange for partnership interests in the defendant, would be a tax-free exchange under the Internal Revenue Code. *Williams*, 159 A.3d at 266. Counsel did not issue the 721 Opinion, and the defendant said that it would not proceed with the merger. *Id.* at 267. The plaintiff sought to enjoin the defendant from terminating the merger agreement, arguing that the defendant had breached the agreement by failing to use "commercially reasonable efforts" to obtain the 721 Opinion and failing to use "reasonable best efforts" to consummate the merger. *Id.* The Delaware Supreme Court held that there was evidence from which a court could have concluded that the defendant breached its obligation to use commercially reasonable efforts to obtain the 721 Opinion. *Id.* at 273. The court

---

[79] More applicable are two points the *CKB* court made (points that did not apply to that case but do apply here): that "[u]nder some circumstances, a party could use best efforts to achieve a contractual goal and fall well short," *CKB*, 809 S.W.2d at 581, and that "[a plaintiff] must establish a causal link between [the defendant]'s breach and [the plaintiff]'s damages," *id.* at 583.

held that, in light of the defendant's possible breach, the burden shifted to the defendant to show that the breach did not materially contribute to the failure of the transaction. *Id.* Significantly, the court held that the defendant could meet that shifted burden simply by pointing out "that the record is barren of any indication that the action or inaction of the [defendant] . . . contributed materially to [counsel]'s inability to issue the 721 Opinion." *Id.* at 274. Similarly, even if the court were to adopt Dr. Codding's argument that the burden shifted to Pearson Education with respect to causation, Pearson Education met that burden by pointing out that the record is barren of any evidence that Pearson Education's action or inaction contributed materially to PSoC sales numbers that did not reach the initial $75 million sales threshold.

Dr. Codding's arguments about burden-shifting do not excuse her lack of evidence regarding causation and damages and are insufficient to withstand Pearson Education's motion for summary judgment. *Cf. Devereaux*, 263 F.3d at 1076 ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325); *McGlinchy*, 845 F.2d at 809 (affirming summary judgment in favor of defendants where "[plaintiffs] submitted no specific facts on which a finder of fact could reasonably conclude that [plaintiffs] actually suffered damages, caused by [] defendants, in any quantifiable amount").

### 2.2.2 Dr. Rives

Second, Dr. Codding argues that she has evidence establishing causation and damages because (1) she pleaded in her SAC that "[t]he evidence is therefore overwhelming that, had Pearson Education used its best reasonable efforts after July 15, 2016 to sell PSoC, rather than abandoning it and selling other course products, it would have achieved PSoC sales levels sufficient to meet Dr. Codding's entitlement to her contractually promised bonus," (2) her counsel had her colleague Dr. Rives review the SAC during her deposition, and (3) "[u]pon her review, Dr. Rives could find nothing factually inaccurate in these paragraphs."[80]

---

[80] Pl. Opp'n to Def. MSJ – ECF no. 161 at 16–17; Pl. Reply Pl. Reply in Supp. of MSJ – ECF No. 187-8 at 10.

This is not evidence. Counsel asked Dr. Rives's to read 70-plus paragraphs of the SAC and then asked whether there was anything factually inaccurate in those paragraphs. Dr. Rives did not adopt the SAC. Dr. Rives caveated her answer by saying, "I won't know about some of these numbers" in the SAC.[81] Upon further questioning, Dr. Rives testified that there were many allegations in the SAC where she did not know, one way or the other, whether they were true or false.[82] Additionally, there is nothing that supports the conclusion that Dr. Rives (who was not a member of the PSoC sales team and does not demonstrably have any expertise in sales) is competent to offer an opinion about what PSoC sales would have been if Pearson Education had exerted additional efforts, or whether those sales would have reached the thresholds necessary for Dr. Codding to receive her bonuses.[83] This deposition-testimony snippet does not raise a genuine dispute of material fact about whether Dr. Codding has evidence on causation or damages.

### 2.2.3 Other witnesses

Third, Dr. Codding claims that other witnesses will demonstrate at trial that Pearson Education would have been able to sell enough PSoC to reach the thresholds for Dr. Codding to receive her bonuses.[84] This argument does not defeat Pearson Education's motion for summary judgment.

Because Pearson Education pointed out that Dr. Codding did not have evidence with respect to causation or damages, Dr. Codding must produce admissible evidence now — not at trial — that shows there is a genuine dispute of material fact. *Devereaux*, 263 F.3d at 1076. She fails to do so. Dr. Codding's or her counsel's conclusions about what some future witnesses might say do not raise a genuine dispute of material fact. *Cf. Reyes v. Premier Home Funding, Inc.*, No. C 08-04606 JW, 2010 WL 11442803, at *8 (N.D. Cal. Mar. 31, 2010 (granting summary judgment to the defendant where "Plaintiff contends that expert testimony will be required to determine what amount of compensation is 'reasonable' in light of the services provided to Plaintiff. However,

---

[81] *See supra* note 65.

[82] *See supra* note 67.

[83] *See supra* note 67.

[84] Pl. Opp'n to Def. MSJ – ECF No. 161 at 17; Pl. Reply in Supp. of MSJ – ECF No. 187-8 at 10.

Plaintiff offers no expert testimony on this issue. Plaintiff's contention alone is not evidence, and therefore cannot create a dispute of material fact.").[85]

\*       \*       \*

Dr. Codding has no evidence regarding causation or damages, essential elements of her breach-of-contract claim. Her attempts to excuse her lack of evidence are meritless. Because Dr. Codding fails to meet her burden of producing competent evidence on causation and damages, summary judgment in favor of Pearson Education is appropriate.[86]

---

[85] Dr. Codding does not identify who these trial witnesses are in her summary-judgment briefing. In a sur-reply that she filed without prior court approval, *cf.* N.D. Cal. Civ. L.R. 7-3(d) ("Once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval, except [for exceptions not applicable here]."), Dr. Codding says that they include two of her former colleagues, Larry Singer and Susan Sclafani. Pl. Sur-Reply in Opp'n to Def. MSJ – ECF No. 178 at 2. She does not cite to anything to support that they are competent to offer an opinion about what sales Pearson Education would have been able to achieve. Indeed, Dr. Codding and her husband at one point asked Mr. Singer to submit a statement opining on what Pearson Education did or failed to do with respect to selling PSoC after Mr. Singer left Pearson Education in 2014, Codding Email – ECF No. 187-5 at 72, and Mr. Singer responded that he did not know what Pearson Education did after he left and did not feel comfortable in expressing such an opinion, Singer Text Message – ECF No. 187-5 at 76.

[86] Pearson Education advances other arguments about why summary judgment in its favor is appropriate or, in the alternative, why summary judgment in Dr. Codding's favor is inappropriate. Among other things, it argues that the Agreements do not in fact require it to use "best efforts" (or any efforts) to market or sell PSoC. Specifically, Pearson Education argues that Dr. Codding and her husband and attorney Mr. Codding knew (while they were negotiating the Agreement and Release in 2016) that Pearson Education might not sell PSoC:

> Dr. Codding knew — before she signed the [Agreement and Release] — that Pearson Education was not required to make any effort to sell PSoC, and that sales efforts could be "delayed because of technical difficulties or some other reason." [March 2016 Codding Letter – ECF No. 187-5 at 15 (COD-00117315).] Dr. Codding knew that delays would not constitute a breach, and she tried to add a specific provision to the draft agreement to address any delays. Pearson Education rejected that proposal, however, and it was not incorporated into the Agreement and Release that Dr. Codding executed. [April 2016 Costello Letter – ECF No. 187-5 at 18.]

> These negotiations make clear that an implied covenant to make best or reasonable efforts to sell PSoC was never "within the contemplation of the parties." *Third Story Music* [*Inc. v. Waits*,] 41 Cal. App. 4th [798,] 804 [(1995)]. It cannot be "rightfully assumed that [such an implied covenant] would have been made if attention had been called to it." *Id.* Indeed, Dr. Codding herself called attention to the fact that Pearson Education was not required to make any effort to sell PSoC by the end of 2019, and she tried to extend the earnings period "for three years from the time when Pearson commences a bona fide commercial effort to sell courses." [March 2016 Codding Letter – ECF No. 187-5 at 15 (COD-00117315).] If the parties had contemplated an implied covenant for Pearson Education to make best or reasonable efforts to sell PSoC by the end of 2019 (as Dr. Codding claims), it would not have been necessary for Dr. Codding to propose extending the earnings period. The implied covenant would have already obligated Pearson Education

## CONCLUSION

The court grants Pearson Education's motion for summary judgment and denies Dr. Codding's motion for summary judgment.

The court denies Dr. Codding's motion for summary judgment with respect to Pearson Education's affirmative defenses, Pearson Education's motion to exclude certain of Dr. Codding's witnesses from offering expert testimony, and Dr. Codding's request to strike certain evidence that Pearson Education submitted with its reply brief, as moot.

**IT IS SO ORDERED.**

Dated: November 8, 2019



LAUREL BEELER
United States Magistrate Judge

---

to "commence[] a bona fide commercial effort to sell courses." *Id.* Given that Pearson Education rejected Dr. Codding's proposal and it was not incorporated into the final Agreement and Release, it would be inappropriate — and entirely inconsistent with the parties' agreement — to impose an implied covenant on Pearson Education to use best or reasonable efforts to sell PSoC. *See Third Story Music*, 41 Cal. App. 4th at 809 (holding that "a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it").

Def. MSJ – ECF No. 187-6 at 11–12.

The court does not need to decide precisely what obligations Pearson Education did or did not have under the Agreements in light of Dr. Codding's failure to present evidence on causation or damages, which dooms her claim regardless of Pearson Education's obligations. The court does address one issue, however: Dr. Codding's continued improper invocation of the "law of the case" doctrine.

At the pleading stage, when Pearson Education was limited to Dr. Codding's SAC, it argued in its motions to dismiss that the Agreements required to use only "reasonable efforts" to sell PSoC, as opposed to Dr. Codding's claim that it was required to use "best efforts." *See Codding*, 2018 WL 4501131, at *8. The court expressly refrained from deciding what efforts the Agreements required Pearson Education to use. *Id.* Dr. Codding argues that Pearson Education's taking the position in its motions to dismiss that the Agreements required it to use only "reasonable efforts" (as opposed to "best efforts") now renders it the "law of the case" that the Agreements obligated Pearson Education to make some efforts to market and sell PSoC. Pl. MSJ – ECF No. 187-1 at 2; Pl. Opp'n to Def. MSJ – ECF No. 161 at 7–8. Not so. "[T]he denial of a summary judgment motion" — or a motion to dismiss — "is never law of the case because factual development is still ongoing. . . . Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise." *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc). The court's decisions on Pearson Education's motions to dismiss do not prevent Pearson Education from arguing in a motion for summary judgment that the parties' 2016 letters — letters that it could not cite in a motion to dismiss — show that the Agreements do not in fact require it to use any efforts to market or sell PSoC. The law-of-the-case doctrine does not control the construction of the Agreements on summary judgment or in any future proceeding.